IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| GLENDA JACOBS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CV-09-BE-2358-NE |
| ) | |
| MICHAEL J. ASTRUE ) | |
| Commissioner of the Social, ) | |
| Security Administration, ) | |
| ) | |
| Defendant. ) | |

MEMORANDUM OPINION

I. Introduction

The claimant, Glenda F. Jacobs, filed applications for a period of disability and disability insurance benefits on December 11, 2006, under Title II of the Social Security Act. The claimant alleges disability commencing on September 30, 2006, caused by degenerative disk disease of the cervical and lumbar spine, degenerative joint disease of the left shoulder and left knee and status post knee surgery, and radiculopathy. The Commissioner denied the claims initially on February 13, 2007. On March 1, 2007, the claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on March 18, 2009. In a decision dated April 22, 2009, the ALJ found that the claimant was not disabled within the meaning of the Social Security Act, and, therefore, was not eligible for disability insurance benefits. On September 18, 2009, the Appeals Council denied the claimant's request for review. The claimant

1

has exhausted her administrative remedies, and this court has jurisdiction under 42 U.S.C. §§ 405(g) and 1631(c)(3).  For the reasons stated below, the decision of the Commissioner is AFFIRMED.

## II. Issue Presented

In this appeal, the claimant argues that the Commissioner erred by failing to properly evaluate the credibility of the claimant's complaints of pain in a manner consistent with the Eleventh Circuit Court's pain standard.

## III. Standard of Review

The standard for reviewing the Commissioner's decision is limited.  This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if his factual conclusions are supported by substantial evidence.  *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims.*"  Walker*, 826 F.2d at 999.  This court does not review the Commissioner's factual determinations *de novo*, but will affirm those factual determinations that are supported by substantial evidence.  "Substantial evidence" is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999.  A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but the court must also view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ.  *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. Legal Standard

Under 42 U.S.C. § 423(d)(1)A), a person is entitled to disability benefits when the person cannot

> engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months.

To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app.1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); *see also* 20 C.F.R. §§ 404.1520, 416.920.

In evaluating pain and other subjective complaints, the Commissioner must consider whether the claimant demonstrated an underlying medical condition, and *either* "(1) objective medical evidence that confirms the severity of the alleged pain arising from that condition *or* (2) that the objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the allege pain" *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991)(emphasis added); *see also Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002); 20 C.F.R. § 404.1529.

## V. Facts

The claimant has a high school education, and was forty-nine years old at the time of the administrative hearing. (R. 28). Her past work experience includes employment as a cashier, solderer, packer, and a nurse's aide. (R. 100-107). The claimant alleged that she became unable to work as of September 30, 2006, because of constant pain and burning sensations up and down her spine, bulging disks in her back, neck problems, and problems with her left knee. (R. 30, 48, 60, 71, 73). She is currently unemployed. (R. 71).

*Physical Limitations*

The claimant has a history of two herniated disks at her L5-S1 vertebrae requiring surgery in 1995 and 1996. Her 1996 surgery consisted of a right sided lumbar laminectomy at L5-S1 with diskectomy (removal of a herniated or damaged portion of a spinal disk). (R. 137, 243). After these surgeries the claimant continued to work until September 30, 2006, at which time she alleges her lower back pain became too severe to allow her to continue working.

On June 24, 2002, Dr. Dale Culpepper, Orthopedic Surgeon at Crestwood Medical Center in Huntsville, AL, diagnosed the claimant with severe disk degeneration at her L5-S1 vertebrae.

He recommended proceeding conservatively. (R. 137). Later that day Dr. Cyrus Ghavam, Orthopedic Surgeon at Crestwood Medical Center in Huntsville, administered an epidural steroid injection. (R. 139-40). On December 9, 2002, Dr. Culpepper diagnosed the claimant with cervical radiculopathy[1] after evaluating her complaints of pain in her neck and right arm. He prescribed Vioxx, ordered a MRI, and scheduled a follow-up appointed once the MRI was completed. Dr. Culpepper reviewed the MRI on December 18, 2002, and diagnosed some degenerative disk disease changes, particularly at the C4-5. (R. 221-22).

On March 6, 2006, the claimant visited Dr. Culpepper, complaining of pain in her shoulder. A MRI scan of her shoulder showed a possible partial thickness tear, but no full thickness tears. (R. 194, 218). On March 17, 2006, Dr. Culpepper performed a left shoulder arthroscopy with subacromial decompression and AC joint resection on the claimant. Post-surgery, his diagnoses were left shoulder rotator cuff tendonitis and impingement syndrome (swimmer's shoulder), and AC joint osteoarthritis. (R. 188).

On April 24, 2006, Dr. Culpepper evaluated the claimant's left knee. A large effusion was present, and she had limited motion in the knee. X-rays did not reveal any fractures or other lesions, and Dr. Culpepper recommended arthroscopy. (R. 217). The claimant met with Dr. Culpepper several times in May and June, 2006. On May 1, 2006, Dr. Culpepper reported that her pain level was much better, but that some swelling was present in her knee. (R. 216). On May 8, 2006, he observed swelling in the claimant's knee, but stated her pain was minimal. (R. 215). On June 12, 2006, Dr. Culpepper again examined the claimant, and concluded that she was

---

[1] The American Academy of Orthopaedic Surgeons describes cervical radiculopathy as neck pain radiating into the shoulder and arm, which is often caused by an injury near the root of a spinal nerve (a "pinched nerve"). American Academy of Orthopaedic Surgeons, http://orthoinfo.aaos.org/topic.cfm?topic=A00332.

doing fairly well, but that she was still having pain in her knee, primarily when trying to squat. He advised her to continue working on recovery exercises, and offered to see her back over the next month if problems persisted. (R. 214).

On November 10, 2006, the claimant, complaining of increased pain in her upper back and difficulty walking, met with Dr. Ghavam. Dr. Ghavam conducted a physical examination, and reported that the claimant's range of motion in her neck was satisfactory, her upper strength was intact, straight leg raising was negative, and she had hyperreflexia in the upper extremities. Dr. Ghavam recommended a cervical spine MRI to evaluate her neck, but postponed further evaluation of her lower back, because he considered this area of less concern. (R. 247).

On November 29, 2006, a MRI scan of the claimant's cervical spine revealed moderate degenerative disk disease most significant at C4-5, diffuse disk bulge and superimposed bilateral uncovertebral spurring, primarily on the left side, with moderate overall left neural foraminal stenosis (constriction or narrowing of the opening though which nerves pass), and mild left lateral spinal stenosis at that level. (R. 254). Dr. Ghavam diagnosed the claimant with cervicalgia (neck pain) with cervical radiculopathy and possible stenosis, but wrote that a CT myelogram was needed for further evaluation. (R. 246).

On December 8, 2006, the claimant underwent a cervical CT myelogram. The CT revealed spondylophyte formation (displacement of a vertebra or vertebral column) with disk protrusion towards the left C4-5, a large right sided posterolateral foraminal herniation at C5-6, and a very slight protrusion at C6-7. Dr. Ghavam diagnosed the claimant with cervical disk herniation with cervical radiculopathy. (R. 244).

On January 15, 2007, Dr. Ghavam conducted a physical exam on the claimant. He described the claimant as well developed and nourished, and in no acute distress. She had full range of motion in her shoulder, wrist and elbow with no intrinsic joint pain, her range of motion in her neck was satisfactory, and she was able to ambulate around the room with no difficulties. The claimant and Dr. Ghavam discussed possible options including continuing as is, medications, surgery, and therapy. The claimant opted for anterior cervical diskectomy and fusion at C4-5 and C5-6. She underwent an anterior cervical fusion from C4 through C6 later that day. Her surgery proceeded normally, and no complications existed. She was discharged on January 16, 2007. (R. 265-70).

Dr. Theodros Mengesha, Neurologist at Huntsville Hospital Neurological Associates, examined the claimant on November 28, 2007, because she claimed to experience frequent falls. The claimant was able to walk on her heels and toes, but could not do a tandem walk. Dr. Mengesha conducted a Romberg test that was severely positive. Dr. Mengesha then reviewed a MRI conducted on October 29, 2007, and determined that her brain was essentially normal. He prescribed Cymbalta for alleviation of numbness and tingling, and referred the claimant for a nerve conduction study. (R. 294-95).

The claimant was also referred to Dr. Roddie Gantt, Anesthesiologist at Tennessee Valley Pain Consultants, Huntsville Hospital Center for Pain Management. On November 9, 2007, Dr. Gantt arranged for her to receive a cervical catheter epidural steroid injection. (R. 314-315). Dr. Gantt subsequently administered epidurals on four occasions: December 3, 2007; January 14, 2008; February 28, 2008; and April 28, 2008. (R. 302, 305, 308, 311).

On December 5, 2007, Dr. Anjaneyulu Alpati, Neurologist at Huntsville Hospital Neurological Associates, performed a nerve conduction test and an EKG. This test revealed a low B12 level, and findings consistent with mild carpal tunnel syndrome. Dr. Alpati found no definitive electrophysiological evidence of diffuse peripheral neuropathy (nerve damage) or left lower lumbar and cervical radiculopathy. (R. 293).

Dr. Mengesha met with the claimant again on January 7, 2008. At this meeting she complained about back pain, but her peripheral neuropathic symptoms were improving. Dr. Mengesha examined the claimant, and concluded that she was alert, possessed normal speech, possessed 5/5 strength in all her extremities, and had diffuse sensory loss to temperature, pinprick, and light touch to the arms and legs. Dr. Mengesha also noted that the EMG/nerve conduction study findings indicated mild carpal tunnel syndrome, with no definite electrophysiological evidence of diffuse peripheral neuropathy or cervical radiculopathy. (R. 292).

The claimant received an epidural injection from Dr. Gantt on January 14, 2008. Dr. Gantt examined the claimant, and described her as almost histrionic when moving from a supile to a prone position, but that this did not appear to correlate with any specific objective symptoms. (R. 308).

On Feb. 20, 2008, the claimant visited Dr. Mengesha. He conducted a Romberg test that was abnormally positive, but the rest of the neurological examination was essentially normal. He hypothesized that the claimant might possibly be suffering from a mild form of subacute combined degeneration of the spinal cord, but his primary diagnosis remained peripheral neuropathy. He advised the claimant to carry a cane to assist with balance. On May 20, 2008,

Dr. Mengesha prescribed Lyrica, Ultram, and Soma to address lingering pain in the claimant's neck and back. A Romberg test was again abnormal, and she had sensory loss to temperature and pinprick in the left L5-S1 dermatome distribution. The rest of the neurological examination was essentially normal. Dr. Mengesha instructed the claimant to call in three weeks to discuss the effects of the medication, and follow up every three months after that. (R. 289-91).

On April 28, 2008, Dr. Gantt administered another epidural. The claimant informed Dr. Gantt that this procedure gave her "significant relief." (R. 302).

On August 12, 2008, the claimant reported to Dr. Mengesha that she stopped taking Lyrica due to its side effects, but that Ultram and Soma "help her significantly." Dr. Mengesha continued her on Ultram and Soma, and prescribed Cymbalta, as that had alleviated her neuropathic symptoms in the past. He instructed the claimant to report back in six months. (R. 287).

The claimant next met with Dr. Mengesha on February 6, 2009. Dr. Mengesha noted that the claimant was experiencing numbness and tingling in her lower extremity, but that her nerve conduction study did not show any neuropathy. He concluded that she probably suffered from radiculopathy with peripheral neuropathy because her B12 level was still low, but that B12 injections were leading to improvement. He discontinued Cymbalta, prescribing Neurontin instead, and continued her on Soma and Ultram. Dr. Mengesha advised the claimant to continue her treatment in the pain management clinic. (R. 285-86).

On December 26, 2006, Alvin T. Rowell, Disability Specialist from the Disability Determination Service, mailed the claimant an Adult Daily Activities Questionnaire. The claimant completed this questionnaire without assistance on December 30, 2006. On this

questionnaire she reported cleaning, cooking, doing laundry, and feeding livestock on a daily basis.  She admitted that her sons and husband helped her lift heavy items when shopping or doing chores, and that she had help mopping floors.  She further stated that she cooked for her family; fed and bathed her dogs; took her father to the doctor's office and washed his clothes; attended parties and socialized with people; visited her family everyday and her friends twice a week; drove her car to visit friends and family; and walked to check on, and feed, livestock.  She stated that, since her condition began, she cannot stand or sit for long periods of time without moving; standing or sitting for too long causes pain in her neck and lower back; she needs a break after performing a task for one hour; and that she cannot finish some tasks because of her pain.  (R. 94-99).

*The ALJ Hearing*

The Commissioner denied the claimant's request for Social Security disability benefits on February 13, 2007.  (R. 48).  The claimant requested and received a hearing before an ALJ.  (R. 53).  On March 18, 2009, the claimant testified before the ALJ that she suffered stabbing pains and experienced a burning sensation up and down her spine.  She claimed that her pain was constant, and had been ongoing for the past four years.  She stated that Ultram and Soma were prescribed for her, but she did not take any pills other than ones sold over-the-counter.  The claimant reported her pain limited her ability to perform household chores, including vacuuming, sweeping, and mopping, and that after performing such an activity for fifteen minutes she would have to lie down for an hour.  She declared that she can pick up ten pounds, is able to cook, but cannot stand up for more than one hour at a time.  (R. 28-35).

Thomas Elliot, a Vocational Expert (VE), testified concerning the types and availability of jobs the claimant was able to perform with her condition. He stated that the claimant had worked as a solderer, cashier, nurse's aide, and a packer, and that all jobs were performed in a manner consistent with the DOT. The ALJ asked Mr. Elliot to assume the claimant was restricted to occasional lifting and carrying of objects up to twenty pounds, was unable to work at unprotected heights, unable to climb ladders, ropes or scaffolding, and restricted to occasional climbing of ramps and stairs and reaching overhead. Mr. Elliot answered that under that hypothetical the claimant would be able to perform her past work as a cashier, and that her past work as a nurse's aide was transferable to light level work such as a companion or personal attendant. The ALJ asked if the claimant would be precluded from performing past work if she were restricted to performing only sedentary work. Mr. Elliot responded that the claimant would be prevented from performing her past work, but she could work in a full-range of unskilled, sedentary positions. He concluded that she could work as a weight tester or a final assembler, and that these jobs existed in sufficient numbers in the regional and national economy. (R. 39-43).

After questioning Mr. Elliot concerning the claimant's specific employment opportunities, the ALJ hypothesized a situation in which the claimant's pain was as severe as she testified. He asked Mr. Elliot to describe the impact such a finding would have on the claimant's ability to work. Mr. Elliot stated that such severe pain would preclude all work regardless of skill level. The ALJ concluded his examination of Mr. Elliot by asking how a need to take frequent breaks to lie down, or having to miss two or more days a month would affect the

claimant's ability to maintain employment.  Mr. Elliot testified that such absenteeism would preclude all possible employment.  (R. 43-44).

*Findings of the ALJ*

On April 22, 2009, the ALJ issued a decision finding the claimant was not disabled under the Social Security Act.  The ALJ found that the claimant met the insured status requirements of the Social Security Act through the date of its decision, and she that had not engaged in substantial gainful activity since September 30, 2006.  The ALJ found the claimant had the following impairments: history of cervical fusion from C4-7; history of arthroscopic surgery of the left knee; peripheral neuropathy; and mild carpal tunnel syndrome.  The ALJ held that medical evidence indicated the claimant had a history of back and knee pain impairments that were "severe" in combination within the meaning of the regulations, but not severe enough to meet or medically equal, either singly or in combination, one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.  (R. 10-16).

The ALJ next considered the claimant's subjective allegations of pain.  He concluded that the claimant's testimony regarding the limiting effects and severity of her pain was not credible. To support his conclusion, the ALJ relied on the claimant's Daily Activities Questionnaire completed in December of 2006.  He concluded that because she reported taking care of her personal needs, preparing meals, performing household chores, and feeding livestock, her level of activity was functionality inconsistent with disabling limitations that would prevent her from performing all work-related activities.  The ALJ next considered the medical evidence in the record.  He stated that while medical records supported a finding of L5-S1 radiculopathy with superimposed small fiber distal peripheral neuropathy, the medical evidence in the record did not

support the level of severity alleged by the claimant. Specifically, he stated that despite physical examinations exhibiting findings consistent with peripheral neuropathy, neither the MRI conducted on October 29, 2007, nor the EMG conducted on December 5, 2007, revealed objective evidence to support this diagnosis. He concluded that objective medical evidence did not indicate that the claimant's conditions caused disabling pain, support her testimony that she suffered severe pain, or objectively demonstrate that she suffered from any condition other than mild carpal tunnel syndrome. The ALJ further stated that the claimant's failure to take her prescribed medication, and the conservative nature of her treatment, were both inconsistent with her allegations that she suffered severe pain. (R. 13-15).

The ALJ assessed whether the claimant retained the residual functional capacity ("RFC") to perform the requirements of her past relevant work. He concluded that the claimant possessed the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) with the limitations that she not perform work requiring exposure to unprotected heights; climbing ropes, ladders, or scaffolding; operations of foot controls; exposure to concentrated areas of cold and heat. She could only perform jobs requiring occasional overhead reaching. He compared the claimant's RFC with the physical and mental demands of her past relevant work as a cashier, and concluded she was able to perform that job as actually and generally performed. The ALJ also found that because of the claimant's past relevant work as a nurse's aide, she possesses skills that are transferable to *light* work as a personal attendant or companion. Finally, based on the findings and testimony of the vocational expert, the ALJ concluded that even if the claimant were limited to *sedentary* work restrictions, she would be capable of performing unskilled sedentary work as a weight tester, final assembler, and a bench hand, and that all of these jobs existed in

sufficient numbers in the regional and national economy. (R. 13-15).

## VI. Discussion

On appeal, the claimant argues that the Commissioner erred by failing to properly evaluate her allegations of severe pain consistently with the Eleventh Circuit Court's pain standard. She posits that the ALJ failed to clearly articulate his reasons for refusing to credit her subjective pain testimony, and that substantial evidence does not support the ALJ's conclusion that her complaints regarding the severity of her pain were not credible. In response, the defendant argues that the ALJ properly applied the Eleventh Circuit's pain standard because he considered the claimant's full history, including her medical records and subjective allegations of pain, and articulated explicit and adequate reasons for finding her allegations not credible.

A three-part "pain standard" applies when a claimant attempts to establish disability through his or her own testimony of pain or other subjective components. The pain standard requires (1) evidence of an underlying medical condition, and (2) *either* (a) objective medical evidence that confirms the severity of the alleged pain arising from that condition; *or* (b) evidence that the objectively-determined medical condition can be reasonably expected to give rise to the alleged pain. *See Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).

Under the pain standard, the ALJ must consider the testimony of the claimant, including her alleged limitations on daily activities that the impairment or combination of impairments causes. *Harwell v. Heckler*, 735 F.2d 1292, 1293 (11th Cir. 1984). If the claimant seeks to establish a disability based on her own subjective complaints of pain, the ALJ's decision regarding the claimant's credibility becomes critical to his decision as to whether the claimant is "disabled." *Walden v. Schwiker*, 672 F.2d 835, 839 (11th Cir. 1982). Credibility determinations

are reserved to the ALJ, subject to the requirement that in making these decisions, the ALJ clearly articulates his findings. *McGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1984). On appeal the reviewing court does not re-weigh evidence or make credibility determinations. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

The testimony of the claimant alone is not sufficient to support a finding of disability based on the claimant's subjective complaints of pain; the ALJ must consider other evidence, such as medical records and the opinions of the treating or consultative physicians. *Landry v. Heckler*, 782 F.2d 1551, 1553 (11th Cir. 1986). The ALJ must then articulate the reasons for accepting or rejecting this evidence, and must state the weight given to the evidence. *Lucas v. Sullivan*, 918 F.2d 1567, 1574 (11th Cir. 1990). Substantial evidence must support such articulation of reasons, or the ALJ must accept the pain testimony of the claimant as true. *Hale v. Bowen*, 831 F.2d 1007, 1012 (11th Cir. 1987). Furthermore, the ALJ cannot reject a claimant's testimony based solely on his own observations or on criteria that objective medical evidence does not substantiate. *Johns v. Bowen*, 821 F.2d 551, 556-57 (11th Cir. 1987). In this case the ALJ conceded that the claimant has severe impairments capable of generating pain; however, he found that the entirety of the medical evidence, and full review of the record, failed to support the claimant's alleged severity of pain.

In the instant case, the ALJ explicitly articulated his reasons for discrediting the claimant's testimony regarding the severity of her pain. He based his conclusion that the claimant's allegations of severe pain were not credible on her Daily Activities Questionnaire, the lack of objective medical evidence supporting her claim, the conservative nature of her treatment, and her failure to take prescribed medication. The ALJ's assessment of the claimant's credibility

15

is corroborated by substantial evidence in the record.

The record contains substantial evidence supporting the ALJ's conclusion that the claimant's subjective allegations of pain were not supported by objective medical evidence. In February, 2009, Dr. Mengesha noted that, despite the claimant's complaining of numbness and tingling, a recent nerve conduction study did not show any signs of neuropathy. In January, 2008, Dr. Gantt observed that the claimant experienced pain when moving from a supine to a prone position, but he further stated that this pain did not correlate to any specific objective symptoms. The ALJ conceded that the claimant exhibited signs consistent with peripheral neuropathy; however, he considered it significant that both an EKG and a MRI failed to provide *objective* evidence supporting this diagnosis.

The record is replete with evidence that, despite the claimant's allegation that she suffered severe pain, treatment provided her relief. On January 26, 2007, Dr. Ghavam conducted a postoperative physical exam, and concluded that the claimant had full range of motion in her shoulder, wrist, elbow and neck, and that she was able to ambulate without difficulty. During a physical exam conducted by Dr. Mengesha in November, 2007, the claimant was able to walk on her heels and toes. She reported to Dr. Gantt in April, 2008, that epidural injections provided *significant* relief. In August, 2008, she told Dr. Mengesha that Ultram and Soma alleviated her symptoms. Significantly, the claimant's physicians continuously recommended proceeding conservatively, preferring to treat her pain with medication and epidural injections.

The record also contains conflicting evidence that the claimant reported constant severe pain, and that treatment did not alleviate her condition. However, the ALJ is the sole determiner

of credibility. *Daniels v. Apfel*, 92 F. Supp. 2d 1269, 1280 (S.D. Ala. 2000) (*citing Grant v. Richardson*, 445 F.2d 656 (5th Cir. 1971)).[2]

The ALJ's rational for rejecting the claimant's subjective complaints of severe disabling pain provides the court with the requisite level of specificity to withstand any allegations of error. Based on the explicit findings of the ALJ, this court concludes that he properly applied the Eleventh Circuit's three-part pain standard. The ALJ's assessment of the claimant's credibility is clearly articulated and corroborated by substantial evidence in the record; therefore, this court concludes that substantial evidence exists to support the ALJ's conclusion that the claimant's testimony of disabling pain is not credible.

### VII. Conclusion

For the reasons stated above, the court concludes that the decision of the Commissioner is supported by substantial evidence and is due to be AFFIRMED.

DONE and ORDERED this 9th day of March 2011.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE

---

[2] *See also, Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.